IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:23CR618 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | |
| RAYMOND BETTS, | ) | <u>UNITED STATES' SENTENCING</u> |
| | ) | <u>MEMORANDUM</u> |
| Defendant. | ) | |

The United States of America, by and through its counsel, Rebecca C. Lutzko, United States Attorney, and Megan R. Miller, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant Raymond Betts. For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully submits that a sentence at the high end of the Guidelines range set forth in the PSR and the parties' Plea Agreement is appropriate in this case.

I. **APPLICABLE LEGAL STANDARDS**

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate

expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

## II. SENTENCING GUIDELINES COMPUTATION

The United States concurs with the Guidelines calculations set forth in the PSR and the parties' Plea Agreement. (R. 19: PSR, PageID 114-15; R. 14: Plea Agreement, PageID 75-76). Betts's base offense level is 7 under U.S.S.G. § 2B1.1(a)(1). A 16-level enhancement applies under U.S.S.G. § 2B1.1(b)(1)(I) for causing loss in the amount of $1,960,000. An additional two-level enhancement applies under U.S.S.G. § 2B1.1(b)(17)(A) because Betts embezzled over $1 million from a financial institution. After a three-level reduction for acceptance of responsibility and a two-level zero-point offender reduction, Betts's total offense level is 20. Betts falls into Criminal History Category I. At an offense level 20 and a Criminal History Category I, Betts's advisory Guidelines range is 33 to 41 months.

## III. APPLICATION OF § 3553(A) FACTORS

### A. NATURE AND CIRCUMSTANCES OF OFFENSE

The United States refers the Court to the description of the offense conduct included in the PSR and the parties' Plea Agreement. (R. 19: PSR, PageID 112-13; R. 14: Plea Agreement, PageID 78-81). The nature and circumstances of the offense counsel in favor of a sentence at the high end of the Guidelines range contemplated in the PSR and the parties' Plea Agreement.

For the seven-plus year period between January 2016 and April 2023, Betts, who was the Vault Manager for Company 1, stole cash from Company 1's vault. The first time, Betts took $1,000 in $50 bills at the end of his workday. Each month thereafter, Betts continued taking money from Company 1's vault by stuffing bound currency straps in the pockets of his tactical

pants, averaging between $2,000 and $5,000 each time. On one occasion, Betts took as much as $300,000 in a single day.

With time, Betts's scheme escalated not only in amount but in complexity, particularly vis-à-vis his efforts to conceal his theft. At the beginning, Betts covered currency straps containing bills of a lower dollar amount with bills of a higher dollar amount. This gave the appearance during a vault audit that the bound straps contained all bills of the higher value—and thus that the vault contained more money than was in fact present after Betts's thefts. Later, Betts began "floating" cash that was supposed to have been transferred to the Federal Reserve Bank ("FRB"). For example, if Betts was supposed to send $100,000 in cash belonging to Client X to the FRB, he sent only $95,000 and kept $5,000 for himself. Betts knew that there was some time before FRB received the $95,000 and reported its receipt to Client X. When Client X eventually reported the discrepancy in amounts to Company 1, Betts was able to "float" the $5,000 from another outgoing shipment of cash to the FRB from another client to cover the missing $5,000 owed to Client X. And finally, Betts created false documents purporting to account for the missing cash. As recently as March 2023, Betts created a fake "Currency Deposit Ticket," which falsely represented that $1.96 million belonging to Victim 1 had been sent to the FRB.

Betts's long-ranging and widespread offense conduct was not isolated or aberrant; instead, each monthly theft—approximately 88 in total—reflected Defendant's ongoing and deliberate choice to engage in a pattern of crime for his own financial gain. It also represented Defendant's choice to exploit the trust his employer placed in him, which had far-reaching consequences for Company 1. Indeed, Company 1 submitted an impact statement highlighting the financial harm and reputational damage to its small, Cleveland-area business because of

3

Betts's theft. The nature and circumstances of Betts's offense conduct thus support a significant sentence.

      B.      <u>HISTORY AND CHARACTERISTICS OF THE DEFENDANT</u>

Betts argues that his personal history and characteristics constitute mitigating factors for this Court at sentencing. (R. 24: Def. Sent. Memo., PageID 148-53). He focuses primarily on his family relationships and support, which will be addressed more fully below. Two facts, however, stand out in the PSR and Defendant's recitation.

First, unlike many defendants who come before this Court, Betts reported a stable, middle-class upbringing and adult life. (R. 19: PSR, PageID 116-17). In addition to his strong family network, he maintained a steady employment record—notably, with the very employer from which he chose to steal—and could have lived comfortably on his salary from Company 1 before undertaking the instant offense. (*See id.*, PageID 118). Yet despite these opportunities and advantages, Defendant chose to steal from Company 1 out of greed.

Second, Betts highlights his acceptance of responsibility, suggesting that his conduct before being charged in this case constitutes a mitigating factor at sentencing. He further argues in his PSR Objection that he confessed entirely of his own volition and that Company 1 "was completely unaware of Defendant's theft up until the moment Defendant confessed." (R. 21: Def.'s Objection to PSR, PageID 137-38). But these revisionist efforts do not tell the full story.

As an initial matter, Betts objects to the bolded portion of Paragraph 14 from the PSR, which states:

> He concealed his behavior a third way by creating false documents purporting to account for the missing cash. In March 2023, **after [Company 1] confronted Raymond Betts regarding the theft**, he created a fake "Currency Deposit Ticket" which falsely represented that $1.96 million belonging to [Victim 1] had been sent to the FRB. Two months later, the defendant hired an attorney, and alongside his attorney, he admitted his wrongdoings and took responsibility for

4

> his criminal acts of embezzlement of $1,960,000, as noted in the two interviews dated May 2, 2023, and May 25, 2023.

(R. 21: Def.'s Objection to PSR, PageID 137 (quoting R. 19: PSR, PageID 113)).[1]  But Betts agreed to this very premise in the factual basis of the Plea Agreement.  (R. 14: Plea Agreement, PageID 80 ("Third, Defendant created false documents purporting to account for the missing cash.  Specifically, in approximately March 2023, **after Company 1 was made aware of Defendant's ongoing theft**, Defendant created a fake "Currency Deposit Ticket," which falsely represented that $1.96 million belonging to Victim 1 had been sent to the FRB.")).  Betts should not now be able to contradict the facts to which he previously agreed.

Moreover, while it is true that Betts voluntarily told Company 1 about his theft, he did so only after his wife confronted him about her suspicion that Betts was stealing money from Company 1 and threatened to go to the authorities.  Betts confirmed during his two recorded interviews with Company 1 that he came forward only after his wife pushed him to do so and informed him that she had already notified others about Betts's conduct, including Company 1.  And indeed, Company 1 independently knew about the issues involving Victim 1 (although it had yet to connect Betts to the theft of those specific funds).  Victim 1 contacted Company 1 in April 2023 indicating that it had discovered two $1.9 million withdrawal tickets from Company 1's vault despite the FRB only receiving one deposit.  As such, while the United States commends Betts for taking responsibility for his actions, this acceptance is already accounted for

---

[1]  The United States notes that Defendant's factual objection is untimely under Federal Rule of Criminal Procedure 32(f)(1) and that Defendant does not appear to have established good cause for the new objection under Rule 32(i)(1)(D).  Regardless, the United States notes that the Court need not resolve this factual dispute under Rule 32(i)(3)(B) should it determine that the matter will not affect its sentencing determination.

in his three-level Guidelines reduction and is otherwise not sufficiently remarkable to justify any further mitigation at sentencing.

Finally, Betts submits testimonials from family and friends, attesting in various ways to Betts's good attributes, such as kindness and generosity. But this is routine in white-collar cases, and nothing in the letters is particularly remarkable. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) (commenting that the "vast majority of defendants . . . continue to receive the love and support of their families" and "[m]any, in turn loves their families and friends . . . and participate in charitable activities"). Importantly, while Betts's family and friends highlight his generosity, Betts neglects to mention that his theft facilitated this same "generous" conduct. For over seven years, Betts embezzled well over what he otherwise lawfully earned from Company 1. This was not Betts's money; it was Company 1 and Victim 1's money. So while Betts was able to give magnanimously to family, friends, and strangers, it was no doubt easier to do so when he was spending money that did not belong to him. The Court should decline to treat this conduct as mitigating.

      C.      THE NEED FOR THE SENTENCE IMPOSED.

Imposing a sentence of imprisonment at the high end of the applicable Guidelines range would reflect the seriousness of Betts's offense, promote respect for the law, and provide adequate deterrence for Betts and others contemplating similar crimes.

**IV.**     **RESTITUTION**

Restitution to Victim 1 is supported by the Guidelines and the law. *See* 18 U.S.C. § 3663; 18 U.S.C. § 3663A. Per the Plea Agreement, Defendant has agreed to pay restitution to Victim 1 in at least the amount of $1,960,000. (*See* R. 14: Plea Agreement, PageID 81). As of the date of this memorandum, the United States understands that Victim 1 is in the process of seeking indemnification and/or reimbursement from Company 1 and/or its insurer for its losses

but that the specific amounts of any such payments have yet to be determined. If Victim 1 receives any such compensation from Company 1 and/or its insurer, Company 1 and/or its insurer may be entitled to all or part of the order of restitution consistent with 18 U.S.C. § 3664(j)(1). As such, the United States anticipates asking the Court at sentencing to postpone its final determination on restitution for the 90-day period contemplated under 18 U.S.C. § 3664(d)(5) so that the Court may appropriately allocate the restitution amount between Victim 1 and any indemnifying or reimbursing party.

## V. CONCLUSION

The offense conduct and other relevant factors fall within the scope of circumstances contemplated by the Guidelines, and a Guideline sentence thus will accomplish the goals of 18 U.S.C. § 3553(a). For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a sentence at the high end of the Guidelines range set forth in the PSR and the parties' Plea Agreement.

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:   /s/ Megan R. Miller
       Megan R. Miller (OH: 0085522)
       Assistant United States Attorney
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3855
       (216) 522-8355 (facsimile)
       Megan.R.Miller@usdoj.gov